UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL KRULL and DEBRA KRULL,

                                        Plaintiffs,          **DECISION AND ORDER**
            v.                                               10-CV-737S

UNITED STATES OF AMERICA and
ROBERT L. MARCUS,[1]
MERCY HOSPITAL OF BUFFALO and
CATHOLIC HEALTH SYSTEM, INC.,

                                        Defendants.

_____


## I.  INTRODUCTION

On September 13, 2010, Plaintiffs commenced this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 et seq. Among other things, they seek money damages relating to injuries Michael Krull allegedly sustained while delivering mail to the United States Post Office in Irving, New York, on October 17, 2007. Discovery is complete and the government has moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The motion is fully briefed and the Court finds there is no need for oral argument.   For the reasons discussed below, the government's motion is denied.


## II.  BACKGROUND

At the time of the incident alleged in the Complaint, Krull was employed by JJJ Express Mail, which had a contract with the United States Postal Service ("USPS") to

_____

[1] Robert L. Marcus was terminated as a defendant on April 24, 2012.

1

transport mail from its Buffalo Processing and Distribution Center ("PDC") in Buffalo, New York, to certain suburban post offices south of Buffalo, and from those suburban post offices back to the PDC. (Docket No. 65 (Def's Statement of Undisputed Facts), ¶¶ 1, 4, 5, 9.) Krull began working at JJJ as a part-time truck driver in 1992, became a full-time driver in 2000, and continued to work as a full-time driver until October 17, 2007, the date of his injury. (Id. ¶¶ 6-8.)

Krull generally arrived at the PDC at 4:30 a.m. to load his truck in time for a 5:00 a.m. departure. On a typical day, he would load twelve "cages," four "hampers," and four "sacks" of mail for delivery to the suburban offices on his route. The cages, weighing between one hundred and three or four hundred pounds, and the hampers, weighing from seventy-five to three hundred pounds, were on wheels, and Krull pushed them onto the truck from a loading dock. Krull physically lifted the sacks of mail, weighing from twenty-five to seventy pounds, and threw them onto the truck. (Id. ¶¶ 11-12; Docket No. 66-2 (Krull Deposition) at 25-29.) The lifting requirement for Krull's position was one hundred pounds. (Docket No. 66-2 at 39-40.)

The Irving Post Office, where the incident occurred, is located in a building owned by former-defendant Robert Marcus and leased to USPS. (Docket No. 65 ¶¶ 2-3.) Krull would arrive there at approximately 6:30 a.m., and usually dropped off four cages of mail. The Irving Post Office has a loading area in the rear and Krull would back his truck up to yellow bollards located there. Prior to October 2007, Krull would enter the building through a rear metal door, which swung inward, and obtain the switch that operated the facility's hoist lift. He would raise the hoist to the height of his truck, kick a steel plate into position, pull the designated deliveries onto the hoist, lower the hoist, and push the deliveries into

2

the post office's rear door. (Id. ¶ 17; Docket No. 66-2 at 31-32, 45-47.) Krull returned to Irving later in the morning to pick up empty cages and any mail that was ready to go to the Buffalo PDC. He would leave the PDC at noon to make afternoon deliveries to his assigned post offices. At 5:15 p.m., Krull began his return trip to Buffalo, picking up mail from his assigned stops that was bound for the PDC. (Docket No. 66-2 at 35-38.)

Under the terms of the lease between building-owner Marcus and USPS, USPS was responsible for maintenance, repairs, and alterations to the Irving Post Office, excepting the roof. (Docket No. 71-2 at 15, 61.) In 2007, the Irving Postmaster, John Carrow, arranged for renovations to the building, including replacement of the rear entry door, which  was rusted through. (Docket No. 65 ¶¶ 14-16.) Carrow was advised by a USPS safety officer that, to comply with the fire code, the new rear door must open outward. (Id. ¶ 18.) The outward-opening door was installed one to two weeks prior to October 17, 2007. (Id. ¶ 19; Docket No. 73 ¶ 2.)

At all relevant times, the hoist lift at Irving was located right next to the rear entry door. (Docket No. 65 ¶ 20.) Once the door was changed to open outward, it struck the steel plate on the lift, preventing it from fully opening. There were no architects or engineers involved in planning the renovations, and Postmaster Carrow did not realize that the hoist plate would block the new rear door from opening until after it was installed. (Docket No. 71-2 at 24-25.) This situation necessitated that Krull manually lift the hinged steel plate so the door could be opened and the lift and door could function together.  (Id. ¶¶ 21-23; Docket Nos. 66-4, -5, -6, -8; 66-2 at 47-48.) Krull estimates that the plate weighed seventy-five to one hundred pounds, and the government's engineering expert opines that lifting the plate required a vertical force of sixty-two pounds. (Docket Nos. 65 ¶¶ 24-25; 66-8 at

3

2.) Krull made two to three trips to Irving per day and, after the new door was installed, he was required to lift the plate twice per visit, once to open the rear door and once to close it. (Docket No. 66-2 at 49-50.) Krull was never required to lift the plate to access the old inward-opening door. (Id.)

Postmaster Carrow was concerned that someone lifting the plate might be injured. (71-2 at 31-32.) He sought to rectify the situation, which he considered a safety hazard, and was told to obtain an estimate for work required to move the lift further from the door. (Id. 56-58.) On October 17, 2007, Krull arrived at the Irving Post Office at approximately 5:45 p.m. When he attempted to lift the steel plate, he felt a popping in his lower back. (Docket No. 65 ¶¶ 25-26.) Krull attempted to work the following day, but felt he was going to pass out and left work to see his primary physician. (Docket No. 66-2 at 61-62.) He rested over the weekend. When he attempted to take a shower the following Monday, he fell and was taken by ambulance to Mercy Hospital, where he remained for approximately one month. (Id. 62-65.)

USPS received a written estimate for moving the hoist lift on October 22, 2007, five days after Krull was injured, and the lift was relocated further from the building thereafter. (Docket Nos. 71-2 at 56-57; 71-7.)

On October 27, 2009, Plaintiffs commenced an action in New York State Supreme Court, Erie County, against Mercy Hospital and Catholic Health System, Inc. Approximately one year later, on September 13, 2010, they commenced the instant case against the United States and Marcus. On March 15, 2011, the United States filed a third–party complaint against the defendants named in the Krulls' state action. (Docket No. 24.) Plaintiffs then amended their complaint in this action, adding medical malpractice and loss

4

of consortium claims against Mercy Hospital and Catholic Health System (Docket No. 39), and thereafter discontinued their state court action. They stipulated to discontinuance of their claims against Defendant Marcus on April 24, 2012. (Docket No. 55.) The United States now moves for summary judgment on the ground Krull cannot establish that the government was negligent.

## III.  DISCUSSION

### A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the

opposing party, summary judgment is improper." <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.</u>, 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

**B.     The FTCA**

In enacting the FTCA, Congress consented to waive its sovereign immunity for:

> claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). Courts considering such claims are bound by the law of the state where the alleged negligence occurred. <u>Richards v. United States</u>, 369 U.S. 1, 9-15, 82 S. Ct. 585, 7 L. Ed. 2d 492 (1962); <u>Delano v. United States</u>, 859 F. Supp. 2d 487, 501-02 (W.D.N.Y. 2012) (citations omitted). There is no dispute that the allegedly negligent acts or omissions at issue here occurred in New York.

To establish the government's negligence, Krull must show, by a preponderance of evidence, that: "the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result of that breach." <u>Stagl v. Delta Airlines, Inc.</u>, 52 F.3d 467 (2d Cir. 1995); <u>Kwitek v. United States</u>, No. 07-CV-826, 2010 WL 3992192, at *9 (W.D.N.Y. Oct. 12, 2010). Here, the parties agree that the applicable duty of care is that of a landowner.

Under New York law, landowners and business proprietors have a duty to maintain their properties in reasonably safe condition. <u>Di Ponzio v. Riordan</u>, 89 N.Y.2d 578, 583

Case 1:10-cv-00737-WMS-JJM   Document 77   Filed 03/25/14   Page 7 of 9

(1997). This duty, however, is not limitless:

> In analyzing questions regarding the scope of an individual actor's duty, the courts look to whether the relationship of the parties is such as to give rise to a duty of care, whether the plaintiff was within the zone of foreseeable harm and whether the accident was within the reasonably foreseeable risks. The nature of the inquiry depends, of course, on the particular facts and circumstances in which the duty question arises.

Di Ponzio, 89 N.Y.2d at 583 (other citations omitted). The Second Circuit has explained that the *foreseeability of a risk arising from a potential plaintiff's presence on defendant's property* is the measure of liability and it is the essential factor in determining the nature and scope of the duty that the landowner owes plaintiff." Michalski v. Home Depot Inc., 225 F.3d 113, 117 (2d Cir.2000) (citations omitted) (emphasis added). It then concluded that, even where a dangerous condition on the property is open and obvious in nature, "it does not relieve a landowner from a duty of care where harm . . . is readily foreseeable by the landowner and the landowner has reason to know that the visitor might not [avoid] the hazard." Id. at 121.

After reciting the relevant law of negligence, the government does not make any argument relating to the three essential elements of a tort claim. Instead, it focuses on a line of New York cases holding that workers generally cannot sue for injuries sustained while confronting the ordinary and obvious hazards of their employment. See Wagner v. Wody, 98 A.D.3d 965, 966 (2d Dep't 2012) (hazard of encountering small piece of glass in household garbage bag was inherent to sanitation worker's duties); Anderson v. Bush Indus., Inc., 280 A.D.2d 949, 950 (4th Dep't 2001) (hazard of being injured by repeated lifting and loading of heavy boxes is inherent in UPS driver's work); Marin v. San Martin Rest., Inc., 287 A.D. 2d 441 (2d Dep't 2001) (hazard of injury from lifting heavy garbage

7

bag and loading it into a sanitation truck is inherent in sanitation worker's duties).

Krull contends that his circumstances are readily distinguishable, and this Court agrees. The cases cited by the government each involved individuals who were injured while performing their regular employment duties in a manner the plaintiff or his employer controlled. Here, Krull has offered testimony and other evidence that lifting a steel plate to gain access to the Irving Post Office was not among his regular duties as a JJJ employee, and that USPS's alteration to the delivery area prevented Krull from carrying out his work in the manner it was to be performed. As such, he has raised an issue of fact sufficient to avoid summary judgment.

The Court also finds unpersuasive the government's contention that: "if [USPS] can be held liable for making Krull lift a 62 pound object, then it apparently can be held liable any time a contract delivery person . . . injures himself lifting a heavy mail sack." (Docket No. 64 at 7.) Had Krull been injured lifting a heavy mail sack, the outcome here might well be different, but that is not the circumstance presented in this case.

## IV. CONCLUSION

For the reasons set forth above, the government's motion for summary judgment is denied.

**V. ORDERS**

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket

No. 63) is DENIED.


SO ORDERED

Dated:    March <u>23</u>, 2014
          Buffalo, New York


<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
Chief Judge
United States District Court